Bernard Stoumen v. Commissioner.
Stoumen v. Commissioner
Docket No. 26431.
United States Tax Court
1953 Tax Ct. Memo LEXIS 338; 12 T.C.M. (CCH) 267; T.C.M. (RIA) 53081; March 13, 1953
*338 Morris Wolf, Esq., Morris H. Goldman, Esq., 12th Floor, Packard Building, Philadelphia, Pa., and Wesley H. Caldwell, Esq., for the petitioner. Jules I. Whitman, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: This proceeding involves deficiencies in income tax and penalties as follows: Year
Deficiency
50% Penalty
1943
$60,154.96
$30,077.48
1944
68,594.32
34,297.16
1945
51,700.99
25,850.50
The issues are whether respondent erred (a) in increasing the amount of petitioner's share of the profits of Fairplay Knitting Mills, a partnership, and (b) in imposing fraud penalties. Findings of Fact Petitioner, an individual residing in Philadelphia, Pennsylvania, filed his returns with the collector of internal revenue for the first district of Pennsylvania. From about 1925 until January 2, 1943, petitioner was engaged in the business of manufacturing men's sportswear under the trade name of Fairplay Knitting Mills. A similar business being conducted by Abraham L. Stoumen, a brother of petitioner, (hereinafter referred to as Abraham), failed in 1930 and thereafter until January 2, 1943, he was an *339 employee of petitioner. On January 2, 1943, petitioner and Abraham entered into an agreement for the production and jobbing of knit goods as equal partners under the trade name of Fairplay Knitting Mills with their place of business at 22nd and Arch Streets, Philadelphia. Abraham acquired his interest as a gift from petitioner. Samuel L. Schwartz, a brother-in-law of petitioner, was a full time employee of petitioner and the partnership at all times after about 1927. The relationship between Schwartz and petitioner was close and cordial. Petitioner's duties in the partnership consisted of selling merchandise, going to mills to arrange for shipment of goods to it, and handling shipments of goods sold. He did not do any of the buying. The books of the partnership were not under his supervision and he had no knowledge of their details. Petitioner signed all of the checks of the partnership drawn against accounts reflected in its books. He did not have a desk in the private offices of the partnership. Abraham was the managing partner and attended to financial matters of the business. He did not do any buying. Schwartz did the buying for the business and supervised operations of the *340 mill, for which he was paid a weekly salary of about $100. He purchased 300,000 or 400,000 pounds of yarn each year for the partnership. On or about February 23, 1943, and May 7, 1943 Schwartz opened checking accounts in his name in the Corn Exchange Bank Trust Company and Irving Trust Company, respectively, in New York, N. Y. (hereinafter referred to as the "bank accounts"), and thereafter made the following deposits in the accounts: 1943
1944
1945
Total
Corn Exchange Bank Trust Co.
$108,883.07
$ 94,284.50
$ 96,847.34 *
$300,014.91
Irving Trust Co.
26,578.84
59,182.51
23,893.52 **
109,654.87
Total
$135,461.91
$153,467.01
$120,740.86
$409,669.78 With the exceptions noted, the deposits consisted of checks issued by the following firms and individuals: 1943
1944
1945
Abe Levine Knitting Mills
$ 84,704.99
$140,964.44
$ 97,083.68
Goodwear Knitting Mills
39,210.02
8,574.99
Manchester Knitted Fashions, Inc.
4,725.00
Bell Garment Co.
6,521.90
3,605.18
Charles E. Hamlin
11,493.86
D. P. McAlaine
12,163.32
Cash
300.00
Unidentified
322.40
Total deposits
$135,461.91
$153,467.01
$120,740.86
Number of deposits
30
29
16
*341 The following checks, which were deposited in the bank accounts, were payable to Schwartz in payment of invoices rendered in his name: 1943
1944
1945
Abe Levine Knitting Mills
$ 3,908.10
$ 5,031.60
Abe Levine Knitting Mills
3,641.40
5,433.36
Goodwear Knitting Mills
14,356.52
$5,064.39
Goodwear Knitting Mills
3,510.60
Charles E. Hamlin
11,493.86
Manchester Knitted Fashions
2,520.00
Manchester Knitted Fashions
2,205.00
D. P. McAlaine
12,163.32
Total
$26,631.02
$8,574.99
$34,122.14 The invoices bore the heading "Samuel L. Schwartz, Manufacturers' Agent 22nd and Arch Streets, Philadelphia, Pa." The slips for deposits made in the Corn Exchange Bank Trust Company account prior to June 29, 1944, were destroyed pursuant to a policy of the bank to keep such records for only seven years. All of the 17 deposit slips made thereafter in the account for a total of $150,537.44 were written by Schwartz. The slips prepared for deposits made in the account in the Irving Trust Company on and after February 18, 1944, 15 in number for deposits totaling $83,026.03, were written by Schwartz. Abe Levine knitted outerwear at a plant in Brooklyn, *342 N. Y., under the trade name of Abe Levine Knitting Mills. He knitted men's sweaters for the partnership from yarn delivered to him by it on consignment. Levine died in December 1945 and his records were destroyed in 1951. Levine's dealings with the partnership were with Abraham. Levine's wife helped him in his office and took an interest in her husband's business. She never met Schwartz but knew that invoices were being received in the office under his name. She had authority to sign checks drawn against the checking account of Levine at the Corn Exchange Bank Trust Company. She did not know until after Levine's death that he maintained a personal checking account in his name at the Manufacturers Trust Company, New York, N. Y.
The sweaters produced by Levine for the partnership were recorded in the books of Levine by a credit to a ledger account in the name of the partnership for the yarn and a charge to the same account for the contract price for the sweaters, which represented the charge for the yarn, and labor. The balance was paid for in cash, which was entered in the account as a credit. From October 29, 1941, until February 11, 1943, about 155 credit entries, totaling about *343 $74,000, were made in the account for yarn and about 25 credit entries, totaling about $19,000, for cash payments. Of the cash paid, $13,950 was made by 17 lump sum payments. Thereafter to the close of 1945 there were about 35 credit entries made, totaling about $1,300, from the yarn book, and about 80 credits, totaling about $340,000, for cash payments, practically all of which were in large odd amounts. Walter E. Knipe & Sons, Inc., Philadelphia, Pa., dyed and processed yarn for the partnershp on its order. In 1943 and 1944 the partnership made 4 and 27 deliveries of 2,347 and 10,871 pounds, respectively, of its yarn to Walter E. Knipe & Sons for dyeing and shipment to the Abe Levine Knitting Mills. The dyeing charges were paid by the partnership and the dyed yarn was shipped as directed. About December 20, 1943, W. E. Hulton Company received 3,233 pounds of yarn from the partnership for dyeing. The partnership paid the dyeing charges. The dyed yarn, at the request of the partnership, was shipped to the Abe Levine Knitting Mills as follows: December 27, 1943
1,500 pounds
December 29, 1943
733 pounds
January 3, 1944
500 pounds
January 5, 1944
500 pounds
*344 The checks drawn by Levine and deposited in the bank accounts were issued against checking accounts of Levine as follows: 1943
1944
1945
Corn Exchange Bank Trust Co. *
$84,704.99
$82,104.33
$73,190.16
Manufacturers Trust Co. **
58,860.11
23,893.52
In November and December 1942 the partnership made eight deliveries of yarn to Walter E. Knipe & Sons with directions that the material be dyed at the partnership's expense and then delivered to Goodwear Knitting Mills, Philadelphia, Pa., which was done. The partnership was charged for the dyeing and any credits for the charges would have been made to the same account. Charges against Goodwear Knitting Mills in the amount of $4,186 for the identical yarn were made on invoices rendered in the name of Schwartz and upon payment in 1943 the checks were deposited in the bank accounts. All of the checks issued by the Goodwear Knitting Mills and deposited in the bank accounts were in payment of invoices rendered in the name of Schwartz for yarn. A shipping ticket of the partnership was used for a shipment made on November 23, 1942, "as of Feb. 1, 1943", payment *345 of which was made in 1943. The amounts received from the Manchester Knitted Fashions were received in 1943 for payment of invoices rendered in the name of Schwartz for 15 knitting machines. The check received from McAlaine was in payment of wool tops shipped in the name of Schwartz in accordance with an agreement that McAlaine would have the wool yarn spun at a spinning mill and render an invoice to him for the yarn. The yarn spun from the wool was billed to the partnership and McAlaine received payment for the invoice. The check received from Hamlin was for wool tops. Schwartz retained the exclusive right to withdraw money deposited in the bank accounts. He withdrew a total of $297,436.34 from the account in the Corn Exchange Bank Trust Company, the last charge therein having been made on May 8, 1946. The balance of $2,578.57 has not been withdrawn. He withdrew a total of $101,452.30 from the account in the Irving Trust Company by charges made to the close of May 16, 1945. A charge of $5 was made in the account on June 4, 1946, which left a balance of $8,197.57, all of which was in the account on September 17, 1951. Of the withdrawals about $200,000 was in cash and approximately *346 $68,000 by checks that could not be identified. None of the checks drawn against the bank accounts was payable to petitioner, and no part of the cash was delivered to him. Other withdrawals to the close of 1945, some amount each taxable year, were used for the following purposes: Purchase U. S. Treasury bearer bonds
$80,506.86
Benefit of petitioner in 1945
9,317.29
Benefit of Abraham
6,205.27
Benefit of Schwartz
27,680.40 The bonds were delivered to Schwartz. It was the practice of petitioner and his brother to have the partnership pay some of their personal bills and charge the amounts to their partnership account. The amount expended in 1945 for the benefit of petitioner without knowledge on his part of the source of the payments were for the following purposes: Catering services
$ 791.00
Vacation expense
1,362.58
Insurance premiums
663.71
Stock, Donchester Co. *
2,500.00
Repay loan made in 1938 or 1939
4,000.00
Petitioner was not aware until after the death of Abraham in 1946 that the payments had been made with funds withdrawn from the bank accounts. He did *347 not receive any of the U.S. Treasury bearer bonds. Prior to May 7, 1946, Schwartz executed notes in favor of the partnership for a total of about $25,000 for money withdrawn from the bank accounts at various times with the consent of Abraham. Schwartz has been making weekly payments of $100 on the notes since about 1947, which amounts petitioner accepted and entered in his books as "prepaid loans". Abraham was informed by a special agent the latter part of April 1946 that the returns of the partnership and the partners would be investigated. On May 2, 1946, Abraham requested him to return the first of the next week, when the books could be made available for the examination. On May 3 or 4, 1946, Abraham informed petitioner that there were "implications" concerning the Goodwear Knitting Mills, that he had opened a couple of bank accounts in New York to keep the business going, and had loaned $25,000 to Schwartz. Until then petitioner did not know that the bank accounts were being maintained. On May 6, 1946, the special agent, at the request of Abraham, granted an extension of two days for submission of the books. That night Abraham destroyed all of the books and records of the *348 partnership, except the general ledger for 1945, and committed suicide the next morning at the plant of the partnership, leaving letters in his handwriting to the investigating agents, Schwartz, and petitioner, bearing the date of May 7, 1946, and reading as follows: "Messrs. Davis & Fisher: "I am sorry to walk out on you this way and while I could take it, I felt that my brother, who had no part in it was simply going to get critically ill by the pressure which was being exerted and in which he was helpless, since he had practically no activity in the end of the business other than clerical work confined to the production of merchandise. "As to the books and records I personally destroyed these, as I felt that any further examination was unwarranted on your part. "Your prolonging your examination would lead nowhere except to kill by degrees my brother who is deserving of better than that." "Sincerely [Signed] "Abe Stoumen" "Dear Sam: "Work with Bon and I am sure every thing will come out all right. "I just couldn't bear to see you and Bon suffer through no fault of your own. "What you did, you did to help the business and I hope it will come out all right." *349 [Signed] "Abe" "Dear Bon: "It is a tough way to wind up our partnership and you are deserving of better. "Your ill health and not being able to be as active as you might, gave me a free hand to do as I wished. "The result is the examination of Goodwear transactions and possibly other implications which are not warranted. "However I feel that I have been responsible for the aggravation you have had for the past 10 days, while you haven't complained, I know that it hurt. "While I should be the last one to give advice, place the affairs with a good lawyer and it will be OK. "I hope that my act won't be taken too hard by you, and tell Sadie that I am sorry - Kiss Rose and your kids for me." "Love [Signed] "Abe" The partnership returns of income for 1943, 1944 and 1945 were prepared on an accrual basis by an accountant from reports made by another accountant of audits of the books. The bank accounts maintained in the name of Schwartz were not entered in the books of the partnership. The accountant who prepared the returns had no knowledge of transactions of the partnership which were not recorded in its books. The returns reported profits of $182,639.99, $153,630.03 *350 and $121,928.82 in 1943, 1944 and 1945, respectively, one-half distributable to each partner. The returns of petitioner for each of the taxable years, filed on March 15 of the next year, reported his distributable share of the profits. In determining the deficiencies and penalties the respondent increased the share of partnership income reported by petitioner by $67,051.55 in 1943, $75,966.17 in 1944 and $59,157.08 in 1945 for unreported taxable income from the partnership. Opinion The respondent determined that the deposits made in the Schwartz bank accounts constituted gross income of the partnership and included in the taxable income of petitioner each year an amount for his one-half interest in the funds. His determination in that regard has a prima facie presumption of correctness and petitioner recognizes that his burden was to show that the action was wrong. Section 182 of the Code requires that partners include in their net income their share of the ordinary net income of the partnership whether or not distributed to them. The basic question is whether petitioner has overcome the finding of the respondent that the money deposited in the bank accounts was income of the *351 partnership. Petitioner and the accountants who audited the books of the partnership for the taxable years and prepared the returns from the audit reports were the sole witnesses on behalf of petitioner at the hearing. The deposits in question were not entered in the partnership books and, therefore, were not reflected in the reports or returns. The substance of the testimony of petitioner is that he was not aware of the bank accounts until a few days before his brother committed suicide and, other than what Abraham told him at that time, he does not know whether the transactions involved in the deposits had any connection with the activities of the partnership. He knew of no black market purchases by Abraham and he exerted no effort to find out "because nobody would admit it". His outward appearance of disinterest in a question so vital to him taxwise is otherwise shown by testimony that he never discussed the matter with Schwartz. At the close of the hearing petitioner testified that his previous testimony was wrong and that he had asked Schwartz what he had done with the money and bonds and was informed that "as far as he knew everything he ever drew out of that bank, or the bonds, *352 were handed over to my brother, Abe Stoumen." The hearing was adjourned at the request of petitioner to afford him an opportunity to put testimony of Schwartz in the record but he waived the right. His counsel admitted at the hearing that he had never consulted Schwartz, who had the exclusive right to withdraw money deposited in the bank accounts, and did all of the buying for the partnership, about what his testimony would be if placed on the witness stand. Petitioner's failure to call Schwartz in an effort to sustain his burden of proof on the income question gives rise to an inference that his testimony would have been unfavorable to him. ; affd., ; ; affd., . Petitioner contends on brief that he met his burden of proof by showing that he reported all of the income of which he had any knowledge and that he received no gain, profit or benefit from the bank accounts opened and maintained in the name of Schwartz without his consent or knowledge. His returns of partnership income merely followed audit reports of the books *353 which did not reflect the bank accounts. Testimony of a taxpayer that his returns reflect all of his taxable income is insufficient, without more, to overcome the presumptive correctness of a determination by the Commissioner to the contrary. ; ; affd., ; . Petitioner has not, so far as the evidence discloses, repudiated the personal benefit he received from the bank accounts before his brother's death, and since then has accepted about $24,000 from Schwartz on notes given to the partnership for money withdrawn from the accounts. This is some indication that he regarded the deposits in the bank accounts as partnership property, particularly in the light of his statement to a special agent that he assumed the present balances in the bank accounts were a partnership matter. Other evidence, most of which was produced by the respondent, goes to support the determinations resulting in the deficiencies. The pattern of the transactions carried out by Schwartz and Abraham is illustrated by our findings showing shipments *354 of wool and yarn of the partnership, the rendition in the name of Schwartz of invoices for the material and payment to him, checks for which he deposited in the bank accounts. Exhibits Z, AA and JJ, which were tentatively admitted in evidence over petitioner's objection, we have concluded were inadmissible, and have therefore excluded them for all purposes, and we have given no consideration whatever to their contents. That Abraham actively participated in the plan as a member of the partnership in carrying out activities of the firm is clear from the facts and inferences to be made from them. They show that he paid with withdrawals from the bank accounts personal bills of petitioner, including a personal loan made in 1938 or 1939, which were normally paid out of the regular bank accounts of the partnership; purchased stock in the name of the partnership; and accepted from Schwartz notes payable to the partnership, apparently for money paid to him or for his benefit out of the bank accounts. Abraham informed petitioner, after being told that the returns of the partnership would be subjected to examination, that the bank accounts had been opened to advance the interests of the partnership *355 and told Schwartz in a letter written the day of his death that "What you did, you did to help the business". The record discloses no business of Abraham other than as an active member of the partnership. The destruction by Abraham of all of the books and records of the partnership, except the general ledger for 1945, infers that they contained evidence that would have been useful to the Commissioner in establishing a direct connection of the bank accounts with the partnership, and hence gross income of the business. Further discussion of the evidence would serve no useful purpose. From a consideration of all of it we conclude that petitioner has not met his burden of proving that the bank deposits were not gross income of the partnership. The deposits made in the bank accounts were included in gross income of the partnership by the respondent without any deductions for cost of goods or otherwise. The facts show that, including the remaining balance of about $17,500 in the accounts, approximately $141,000 was used for various purposes, leaving $268,000 in round numbers, of which about $200,000 was withdrawn in cash and the remainder by checks that could not be identified. Petitioner *356 contends on brief that if "it could be inferred" that the deposits unaccounted for were used to buy yarn for the partnership in the black market at illegal prices, the amount should be treated as cost of goods in computing the profits of the partnership. Petitioner had no knowledge of black market purchases made by Abraham and made no attempt to find out. On brief he frankly admits that the evidence in the case does not establish what disposition was made of the cash and money represented by the unidentified checks, and under the circumstances all we can do is to resort to guesswork. The respondent's action necessarily carries a determination that the cost of material involved in the transactions was paid by the partnership out of funds entered in its books and that the amount is reflected in the returns filed by the partnership. As to the deals with Abe Levine Knitting Mills, his contention is that the partnership books reflect the cost of the yarn and Levine's charges for sweaters, which includes the price paid to Schwartz on his invoices for the yarn, resulting in duplicate charges for the yarn. In , proof was made of expenditures *357 of large sums for travel and entertainment. In the other cases cited by petitioner it was shown that cash was paid for used automobiles in black market dealings. The established facts furnished a basis for allowing some portion of the known expenditures. Here, any conclusion on our part that some part of the amount in question was used for black market purchases of yarn or otherwise paid out as cost of goods would be mere conjecture and speculation, particularly in the absence of any proof, or independent knowledge, that during the taxable years black market dealings were not unusual in businesses such as the one in which the partnership was engaged. There could be no inference that such was the fact. An inference is a reasonable deduction from evidence and may not rest upon guesswork. ; ; ; . The application of the Cohan rule, which the petitioner suggests, requires some evidence not present here. This lack of basis for allowance of *358 some amount is due, at least to a large extent, to the disinterest manifested by petitioner in learning the disposition of the unexplained withdrawals from the bank accounts. On the evidence, we find no justification for disturbing the respondent's action in including petitioner's share of the defaults in his income. As to the fraud penalty respondent's burden was to show by clear and convincing evidence that petitioner's returns were not only false or fraudulent, but that they were filed with intent to evade tax. Any intent of petitioner to evade tax must be found to exist when his returns were made, to justify the imposition of the fraud penalties. . The returns were false to the extent that they did not include any of the partnership income that found its way into the bank accounts in question. The theory of respondent is that petitioner was aware of the dealings giving rise to the income at the times he filed his returns and that his testimony to the contrary is incredible, and therefore without probative value. In the light of petitioner's declarations that he made no investigation to ascertain the circumstances surrounding the *359 transactions, there would be reason for doubting the veractity of his testimony in that regard. Light cast upon it by other evidence, however, in our opinion, substantiates his story. Abraham's suicide note to Schwartz contains a statement that the latter and petitioner were free of blame for the tax difficulties then about to be unearthed. Petitioner would not have been blameless if he had conspired with his partner or previously, directly or indirectly, acquiesced in the dealings. Abraham's note to petitioner accepts full responsibility for the secret dealings he carried out on behalf of the partnership. A taxpayer is under a legal duty to exercise reasonable care in assembling data for the filing of an accurate return and may not ignore information accessible to him. Petitioner discharged that duty by reporting all of the profits shown to be distributable to him in an audit report of the books of the partnership in the absence of any knowledge of other partnership income. The data for his returns was obtained from normal sources by a disinterested party. He did not deliberately refrain from obtaining information for his returns; rather he obtained it from the most logical and *360 reliable source. It was not his duty as protection against a fraud penalty to ascertain, if necessary by an exhaustive investigation at his expense, whether his partner, whom he was justified in believing to be loyal, was carrying on partnership activities by secret methods. Although petitioner's returns were false in that they did not report all of his share of the profits of the partnership, they were not filed with intent to evade tax. Accordingly, respondent's finding that part of the deficiency each year was due to fraud with intent to evade tax was error. Decisions will be entered finding the deficiencies in income tax to be in the amounts determined by the respondent. Footnotes
*. Last deposit August 14. ↩
**. Last deposit April 20.↩
*. Business account. ↩
**. Personal account.↩
*. A total of $5,000 used to purchase stock for the partnership.↩